**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FLEETWOOD SERVICES, LLC, ROBERT L. FLEETWOOD and PAMELA A. FLEETWOOD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COMPLETE BUSINESS SOLUTIONS GROUP, INC. d/b/a PAR FUNDING; PRIME TIME FUNDING, LLC; JOHN AND JANE DOES<br><br>Defendants. | Civil Action No. 18-cv-00268 (JS)<br><br>JURY TRIAL DEMANDED<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs Fleetwood Services, LLC, Robert L. Fleetwood and Pamela A. Fleetwood file their Complaint against Defendant Complete Business Solutions Group, Inc. d/b/a Par Funding, Prime Time Funding, LLC, and the John and Jane Doe defendants (the "Investor Defendants") and allege as follows upon personal knowledge as to themselves and their own acts and experience, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1. This is a RICO action to save a small Texas business, and other similarly situated small businesses, from financial ruin at the hands of a scheme by the Defendants to originate, fund and collect on usurious and illegal loans. The Defendants prey upon small, financially distressed businesses in Texas and throughout the United States and fraudulently induce them into advances pursuant to so-called future account receivable purchase agreements or merchant case advance agreements. The terms and conditions of these agreements are wholly inaccurate,

and knowingly designed and/or used by the Defendants to deceive the small businesses and others into believing the agreements do not contemplate a loan transaction so that they do not trigger the criminal usury laws of various states. When Plaintiffs and other small businesses cannot meet their obligations under these agreements, Defendants offer new advances under even more unconscionable terms. Eventually, the terms become too oppressive, the small businesses default, and the Defendants aggressively pursue the small businesses and their owners for repayment of the amounts due under the agreements, often employing threatening, deceptive and illegal collection tactics. In the end, Plaintiffs and other the small businesses face certain financial ruin while the Defendants recover not only the principal advanced, but also interest at rates that exceed 300%, which rate is far greater than any interest permitted by applicable law.

## INTRODUCTION

2. Plaintiffs Fleetwood Services, Mr. Fleetwood and Mrs. Fleetwood were victimized by a predatory merchant cash advance lender and its respective broker, who intentionally and systematically took advantage of Plaintiff Fleetwood Services at a time when it was experiencing cash-flow issues.

3. Plaintiffs are not alone. Numerous other small businesses and citizens across the nation have similarly been victimized by the same predatory lending scheme, as evidenced by the number of lawsuits filed by victims in California, Massachusetts, Michigan, Mississippi, New York, and Pennsylvania, all claiming similar cash advance transactions were based upon false and misleading representations.

4. The Defendants' financing activities are not regulated by the government and the fees, penalties and rates are not subject to any regulatory oversight.

5. The Defendants use this lack of regulatory oversight to evade state usury laws by creating agreements that are wholly misleading, and intended to deceive courts around the country into believing the agreements do not constitute a loan transaction but, rather, the purchase of future receivables to which usury laws do not apply. In reality, no receivables are assigned or transferred, the small businesses continue to collect the proceeds thereof and the amounts advanced are repaid through daily payments by the small businesses at annualize interest rates that often exceed 100%.

6. As Bloomberg News has reported, the merchant cash advance industry in which the Defendants operate is "essentially payday lending for businesses.[1] It's a high-risk market, and interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's." *Id.*

7. The industry has increasingly come under national scrutiny for its devastating impact upon small businesses. In June of 2017, Congressman Emanuel Cleaver, II launched an investigation of small business financial technology ("FinTech").

8. Congressman Clever was "particularly interested in payday loans for small businesses, also known as 'merchant cash advance"[2] such as the one at issue in this litigation.

9. He expressed concern that "some FinTech lenders may be trapping small business owners in cycles of debt…"

10. The National Consumer Law Center came to the same conclusion:

> Merchant cash advances operate very similarly to payday loans and have similar problems. A lump sum of cash is taken out as an advance on a borrower's future

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2] Scott M. Pearson, *House Member Launches FinTech Lending Investigation*, CONSUMER FINANCE MONITOR (June 26, 2017), https://www.consumerfinancemonitor.com/2017/06/26/house-member-launches-fintech-lending-investigation/.

sales. The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[3]

11. As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt."[4]

12. According to the Consumer Financial Protection Bureau, over 19 million U.S. households resort to payday loans. Of that number, almost 70% of borrowers have to take out a second loan to cover the first, and 20% end up saddled with 10 or more loans, one after the other.

13. The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."[5]

14. The New York Attorney General's Office has also acknowledged the damage these loans do, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay."[6]

15. Defendants are the commercial equivalent of payday lenders.

---

[3] National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017)http://www.nclc.org/images/pdf/banking_and_payment_systems/ fintech/comments-fintech-jan2017.pdf..

[4] Octavio Blanco, *Controversial Cash Advances Come At A High Cost To Small Businesses*, CNNMONEY (Dec. 1, 2016, 2:28 PM), http://money.cnn.com/2016/12/01/news/economy/merchant-cash-advance/index.

[5] Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017 and April 14, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.

[6] Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-ny-atty-general.pdf.

16. Defendants' scheme is designed to trap the small business in a cycle of never ending debt so that Defendants can reap as much profit as quickly as possible. When the small business cannot make the daily payments required by their agreements, they offer the small business new advances under more onerous terms. Ultimately, the small businesses cannot keep up with the daily payments required under these agreements and upon default, the Defendants aggressively pursue their full recourse rights against the small businesses and their owners who frequently guarantee repayment of the advances.

17. As one small business protection advocate has put it, Defendants are "in the business of helping [small] businesses fail." *Bloomberg, supra.*

**THE PARTIES**

18. Plaintiff Fleetwood Services, LLC ("Fleetwood Services") is a Texas limited liability company with its principal office in Dallas, Dallas County, Texas.

19. Plaintiff Robert L. Fleetwood ("Mr. Fleetwood") is a natural person residing in Dallas, Dallas County, Texas.

20. Plaintiff Pamela A. Fleetwood ("Mrs. Fleetwood") is a natural person residing in Dallas, Dallas County, Texas.

21. Defendant Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG") is a corporation organized and existing under the laws of Delaware, with a principal place of business located at 141 N. 2nd St., Philadelphia, Pennsylvania, 19106.

22. Defendant Prime Time Funding, LLC ("Prime Time") is a limited liability company duly organized and existing under the laws of the Commonwealth of Pennsylvania.

23. On information and belief, each of the John and Jane Doe Defendants are investors in one or more of CBSG or Prime Time and each are citizens of New York, New Jersey or Pennsylvania.

## JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Fleetwood's claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68. The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

25. Additionally, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

27. Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of Pennsylvania, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL BACKGROUND

28. Plaintiff Fleetwood Services is a small business, providing golf course construction, development, renovation and remodeling. Plaintiffs Mr. Fleetwood and Mrs. Fleetwood are its owners.

29. Defendant CBSG is a lender in the merchant cash advance industry, tempting its customers with promises of immediate working cash.

30. In or about January 2017, Plaintiff Fleetwood Services experienced cash flow issues and was at that time unable to qualify for a conventional loan. In order to save its business, Plaintiff Fleetwood Services had no option but to enter into various merchant cash advance agreements with other lenders, which had resulted in daily ACH debits of $6,667.00 per business day from Plaintiff Fleetwood Services' business account.

31. In or about January 2017, Defendant Prime Time, a broker for Defendant CBSG, contacted Plaintiff Fleetwood Services offering to provide it with the following:

a. financial consulting services with respect to managing its existing debt; and

b. a debt consolidation program that would provide capital for paying off existing debt as well as fresh capital with which to grow business.

32. On or about January 4, 2017, Plaintiff Fleetwood Services entered into a loan transaction with Defendant CBSG, purporting to be in the form of a purchase of Plaintiff Fleetwood Services' future receivables. Defendant Prime Time acted as a broker and facilitated the transaction. The loan was disguised in the form of a purchase of Plaintiff Fleetwood Services' future receivables under a *Factoring Agreement* with Defendant CBSG (the "Par Agreement") that provided as follows:

| **Purchase Amount** | **Purchase Price** | **ACH Payments** | **Other Fees** | **"Specified Percentage"** | **Undisclosed APR** |
|---|---|---|---|---|---|
| $370,000 | $547,600 | $5,000.25 x 110 | $995.00 | 25% | 114.07% |

33. Terms of the Par Agreement included, but were not limited to:

a. In exchange for providing a total of $370,000.00, Plaintiff Fleetwood Services became obligated to repay $547,600.00 by way of 110 payments of $5,000.25, with payment in full estimated to be made by June 12, 2017;

b. Full recourse protection for Defendant CBSG in event of default or bankruptcy. Plaintiff Fleetwood Services was required to execute a security agreement; Plaintiffs Mr. Fleetwood and Mrs. Fleetwood were required to execute personal guarantees as well as confessions of judgment as a condition of the transaction, thereby permitting Defendant CBSG to immediately seize Plaintiff Fleetwood Services' business assets as well as the personal assets of Plaintiffs Mr. Fleetwood and Mrs. Fleetwood and to obtain a Judgment by Confession without even notifying them;

c. Plaintiff Fleetwood Services was required to turn over all its user names, passwords and bank account information. Any attempt by Plaintiff Fleetwood Services to change either the user name or password without advising Defendant CBSG was defined as an event of default;

d. Failure by Plaintiff Fleetwood Services to make the daily fixed payment was defined as an event of default, even if Plaintiff Fleetwood Services had no receivables that day;

e. A purported 25% was identified as the specified percentage of receivables at issue, which had nothing to do with the terms of repayment other than to appear as though that was the percentage of interest being charged for the loan; and,

f. Substantial fees could be assessed by Defendant CBSG for, including but not limited to, insufficient funds ($75.00 each up to four times before default declared), rejected ACH attempts ($100.00), change of bank accounts ($50.00), default fee ($5,000), and collection expenses in event of default.

34. The purported fair market value of Plaintiff Fleetwood Services' future receivables was unilaterally dictated by Defendant CBSG, and was based upon the credit worthiness of Plaintiff Fleetwood Services. In contrast, a true factoring agreement determines the fair market value of the receivable, based on the credit worthiness of the customer who is expected to pay the receivable.

35. The Par Agreement purported to purchase 25% of Plaintiff Fleetwood Services' accounts receivables. However, Defendant CBSG's fixed daily debits have nothing to do with any calculation of Plaintiff Fleetwood Services' receivables. Rather, any and all receivables from any customer in any amount based on any sale is subject to transfer to Defendant CBSG for payment of the daily fixed debit.

36. Pursuant to the terms of the Par Agreement, as opposed to a true factoring arrangement, Plaintiffs Mr. Fleetwood and Mrs. Fleetwood bear the entire risk of a customer not paying, rather than Defendant CBSG.

37. In reality, the true purpose of the Par Agreement was to protect the financial interests of Defendants Prime Time and CBSG, while increasing Plaintiff Fleetwood Services' dependence on future loans, because the debt consolidation program offered by Defendant CBSG was designed to fail.

38. In furtherance of Defendants Prime Time and CBSG's fraudulent and deceptive scheme, they fraudulently and/or negligently induced Plaintiff Fleetwood Services to enter into the purported debt consolidation program by making knowingly false and misleading representations such as that "the purpose of the [CBSG] consolidation funding program is for [Fleetwood Services] to move away from cash advance companies."

39. Defendants Prime Time and CBSG repeatedly represented that the consolidation funding would alleviate daily cash flow concerns by reducing Plaintiff Fleetwood Service's daily ACH debits from $6,667.00 per business day to $5,000.25, a savings represented to be of approximately $1,666.75 each business day.

40. In an effort to intentionally mislead and/or negligently make Plaintiff Fleetwood Services believe that its cash flow would improve, Defendants Prime Time and CBSG represented that Defendant CBSG would be wiring in a set amount of cash infusion over an initial nine (9) weeks of the loan, so that those funds could be used to make Plaintiff Fleetwood Services' payments to other lenders. However, by the time Defendant CBSG took the 33rd ACH from Plaintiff Fleetwood Services' bank account, all of the upfront cash infusion that was used to induce Plaintiff Fleetwood Services into the debt consolidation program was used up. As a result,

Plaintiff Fleetwood Services was left paying thousands of dollars more to Defendant CBSG than it had been paying prior to the debt consolidation program offered.

41. Defendants Prime Time and CBSG conspired to make these knowingly false, misleading and/or negligent representations in an intentional attempt to lead Plaintiff Fleetwood Services to believe that this consolidation program would improve its cash flow, when in actuality, it was purposefully and/or negligently designed to worsen Plaintiff Fleetwood Services' cash flow and thereby increase its dependence on further loans exclusively from Defendant CBSG. In fact, another hidden term of the Par Agreement conveniently limited Plaintiff Fleetwood Services to seeking any further business loans exclusively from Defendant CBSG.

42. The cash flow benefit touted by Defendants Prime Time and CBSG not only quickly evaporated over the life of the loan, but resulted in a longer loan term and the payment of additional interest. As expected and/or negligently designed, the daily payments under the debt consolidation program forced Plaintiff Fleetwood Services to either come up with its own additional capital or borrow even more money from Defendant CBSG. Coincidentally, it was about that time that Plaintiff Fleetwood Services became financially strained from the existing relationship with Defendant CBSG that it was offered an opportunity by Defendant CBSG to refinance its remaining balance, at a reduced daily rate but for an extended additional period of time.

43. During the course of the Par Agreement, there were days when there were insufficient funds to cover the daily ACH debit taken by Defendant CBSG. On a number of occasions, threats were made by a representative at Defendant CBSG that unless payments in full were made, a default would be declared. Further, Plaintiffs Mr. and Mrs. Fleetwood were

warned that if default was declared they would lose the business, their house and all their personal assets. These threats caused tremendous emotional and mental distress to Plaintiffs Mr. Fleetwood and Mrs. Fleetwood since everything they owned was at risk of seizure and/or foreclosure.

44. Moreover, in direct conflict with the reconciliation provision of the contract, CBSG charged Fleetwood Services over $11,000 in admitted "Finance Charges" in exchange for lowing the daily payment amount:

| | | | |
|---|---|---|---|
| 03/16/17 | $ 5,000.25 | $ 312,588.25 | Payment |
| 03/17/17 | $ 3,250.00 | $ 309,338.25 | Payment |
| 03/17/17 | $ (7,001.00) | $ 316,339.25 | Finance Fee |
| . . | . | . | |
| 04/28/17 | $ 5,000.25 | $ 209,712.25 | Payment |
| 05/01/17 | $ 3,000.00 | $ 206,712.25 | Payment |
| 05/01/17 | $ (4,000.00) | $ 210,712.25 | Finance Fee |

45. That is absolutely not how a factoring agreement works but it is exactly how a loan works. Even troubling, CBSG charged Fleetwood Services this "Finance Fee" even though there is absolutely no right to charge a "Finance Fee" anywhere in the agreement.

46. After being trapped in Defendant CBSG's tentacles without ability to put an end to the debt consolidation scheme, Plaintiff Fleetwood Services finally qualified for a Small Business Loan with a traditional lender. On July 5, 2017, Plaintiff Fleetwood Services was able to pay-off Defendant CBSG in full. Notwithstanding, Plaintiff Fleetwood Services continues to receive calls from brokers and lenders seeking to tempt Plaintiff Fleetwood Services with additional merchant cash advances.

## C. The Agreements are disguised loans.

### *a. The "Daily Specified Amount" is a disguised, fixed, loan payment*

47. The Agreements required Plaintiffs to make daily payments to CBSG, purportedly based on a specified percentage of Plaintiffs' daily receivables.

48. This "Daily Specified Amount" is allegedly based on a good-faith estimate of Plaintiffs' daily future receivables, but, in reality, it is a knowingly false term unilaterally dictated by CBSG in an attempt to avoid usury laws. In fact, the payment is based on the value of the loan, not Plaintiffs' daily receivables.

49. Plaintiffs were required to pay the "Daily Specified Amount" until CBSG received the "Purchased Amount" in full.

### *b. The "Purchased Amount" is the disguised repayment of principal and interest*

50. The purported "Purchase Amount" of the receivables is also complete fiction. In each of the Agreements, Defendant CBSG represents that the "Purchased Amount" is tied to the value of the purchased receivables. In reality, however, the alleged fair market value was unilaterally dictated by CBSG based on the creditworthiness of the merchant. In contrast, true factoring agreements determine the fair market value of the receivable based on the credit worthiness of the customer expected to pay the receivable.

51. Furthermore, the Agreements are not tied to specific and existing contracts for goods already delivered by the merchant to a customer. In other words, the right to repayment is not tied to the value or money owed to Plaintiffs based on goods or services already provided to a customer who has not yet paid, but instead is based on any and all future receivables based on the sale of goods or services by Plaintiffs until the "factoring agreement" was paid in full. By definition, these terms do not constitute a factoring agreement, but rather a loan.

*c. The Agreements provided for full recourse in the event of a default or bankruptcy.*

52. Unlike a true factoring agreement, the terms of the Agreements provided for absolute payment from the Plaintiffs.

53. If the Plaintiffs were ever to miss a payment, they would be in default and CBSG would be entitled to confess judgment against the Plaintiffs.

54. The Agreements allowed for up to four nonsufficient fund fees of $75 before default would occur.

55. In order to obtain the loans, Fleetwood was required to grant to CBSG "a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory … now or hereafter owned or acquired by SELLER/MERCHANT and (b) all proceeds, as that term is defined in Article 9 of the UCC . . . ."

56. The security agreement further provided that, upon default, Defendant CBSG "may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration of otherwise."

57. Fleetwood was also required to personally guarantee performance of the representations, warranties and covenants under the Agreements.

58. Further, should Plaintiffs ever enter bankruptcy, the Agreements provided "Protections 2 [confession of judgment] and 3[enforcement of security interest in collateral] are immediately invoked."

**FIRST CAUSE OF ACTION**
**Tex. Bus. & Comm. Code § 17.44 (a)**

59. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

60. Defendants are not residents of Texas and do not maintain or possess assets in the State of Texas.

61. Defendants' conduct in inducing Plaintiffs to enter into the loans involved a series of consumer and commerce related transactions that substantially occurred within the State of Texas.

62. Defendants also violated Tex. Fin. Code §305.001(a) and Tex. Fin. Code §303.009(c) because the interest rate of the Defendants' Agreement was at least 114%.

63. Because a violation of Tex. Fin. Code §305.001(a) and Tex. Fin. Code §303.009(c) are public policy statutes, a violation thereof is a per se violation of Tex. Bus. & Comm. Code § 17.44 (a).

64. The individual Plaintiffs are also entitled to damages they have suffered "mental anguish" under Tex. Bus. & Comm. Code § 17.50(b)(1), which was caused by Defendant's unlawful conduct.

65. In order to deter Defendants from committing these unlawful practices against future victims, Plaintiffs are also entitled to treble damages under Tex. Bus. & Comm. Code § 17.50(b) because Defendant's willful and unlawful actions have caused harm to Plaintiffs and other similarly situated consumers.

66. Defendants also violated Tex. Bus. & Comm. Code § 17.44 (a) by including unconscionable and unfair provisions in connection with the loan agreement, which was a contract of adhesion. Among these unconscionable and unfair provisions, Defendants required Plaintiffs to:

a) Waive the right to a jury trial;
b) Pay Defendant their attorney's fees at a punitive rate that was not measured by the quantum meruit of fees earned but on the amount in default;
c) Waive the right to participate in a class action;
d) Waive the right to seek legal redress in their home state;
e) Waive the right to contest the forum of any other jurisdiction Defendant unilaterally select;
f) Execute a Confession of Judgment for the full amount of debt in violation of Texas law;
g) Execute a Power of Attorney;
h) Execute a Security Agreement giving Defendant a UCC lien on all of its assets;
i) Execute a personal guarantee making the individual owner of the business personally liable for any default under the agreement;
j) Indemnify Defendant against third-party claims;
k) Waive claims for direct, consequential and punitive damages; and
l) Consent to crippling default penalties and enforcement actions.

67. Defendants' conduct was willful, unfair and unlawful.

68. Defendants willfully violated Tex. Bus. & Comm. Code § 17.44 (a).

69. Plaintiffs suffered damages as a direct result of Defendants' unlawful, unfair and deceptive acts.

## SECOND CAUSE OF ACTION
**Texas Usury Statute**

70. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

71. Tex. Fin. Code §305.001(a) provides that a creditor who contracts for, charges, or receives interest greater than the legal maximum is liable to the obligor for an amount that is equal to the greater of: (1) three times the difference between the maximum allowable legal interest and the total amount of interest charged, or (2) the lesser of $2,000 or 20% of the principal amount.

72. The maximum interest rate allowed under Tex. Fin. Code §303.009(c) is 28%.

73. The most that could have been charged in interest under Texas law is $8,945.45.

74. The interest rate of the Defendants' Agreement was at least 310%.

75. The Defendants' Agreement charged $177,600 in interest, which is a difference of $168,654.55.

76. The loan proceeds were used to purchase consumer goods.

77. Accordingly, Plaintiffs are also entitled to statutory damages in the amount of $505,963.65 under Tex. Fin. Code §305.001(a).

78. In addition, Tex. Fin. Code § 305.004(a) provides that: "***In addition to the amount determined under Section 305.003***, a creditor who charges and receives legal interest that is greater than twice the amount authorized by this subtitle is liable to the obligor for:

(1) the principal amount on which the interest is charged and received; and

(2) the interest and all other amounts charged and received.

79. Accordingly, in addition to the $505,963.65 required under Tex. Fin. Code §305.001(a), Plaintiffs are also entitled to $547,600 in total principal and interest charged by Defendants.

**THIRD CAUSE OF ACTION**
**Fraud**

80. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

81. Defendants intentionally misrepresented the true nature of the transactions in order to avoid application of Texas criminal laws.

82. Defendants knowingly misrepresented that the disguised loans were enforceable when they were illegal under law by, *inter alia*, e-mailing Plaintiffs copies of the Agreements, requesting that Plaintiffs execute the Agreements and requesting that Plaintiffs authorize CBSG to make daily withdrawals of the Daily Specific Amount from the Bank Account, all of which

created the false impression that the Agreements are legally enforceable and that Plaintiffs are obligated to repay when they were not.

83. Defendants obtained Plaintiffs written authorization to collect on the Agreements via daily ACH withdrawals from the Bank Account and CBSG collected upon these illegal contracts via ACH withdrawals from the Bank Account, which created the false impression that the Agreements are legally enforceable and that Plaintiffs are obligated to repay when they were not.

84. These false impressions were material, and Plaintiffs did not reasonably know that the contracts were illegal. In fact, Plaintiffs only became aware of their illegality when informed by counsel.

85. In addition, Defendants falsely represented the market value of the future receivables that CBSG purported to purchase in each of the Agreements. This stated value was not based on any true market value assessment but rather was a knowingly false representation unilaterally made by Defendants in order to disguise the true nature of the Transactions.

86. Defendants' misrepresentations were intended to induce reliance because if Plaintiffs were aware that (1) the Agreements were illegal and (2) the market value of the receipts were incorrect, Plaintiffs would not have executed the documents and entered into the Transactions.

87. Defendants knew that the representations were false at the time they were made.

88. Defendants made these representations with the intent to deceive Plaintiffs, and with the intent to avoid the criminal usury laws.

89. Plaintiffs reasonably relied upon these knowingly false representations to their detriment, as it executed the Agreements and was forced to pay interest in excess of Texas' criminal usury threshold.

90. Plaintiffs were directly and proximately damaged by Defendants' knowingly false representations by paying interest and principal on criminally usurious loans for which they had no legal obligation to repay.

91. The conduct of Defendants was intentional, outrageous and in reckless disregard of the Plaintiffs' rights.

**FOURTH CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(c)**

92. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

**A. Culpable Persons**

93. CBSG is a limited liability company capable of holding a legal interest in property and are thus "persons" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

**B. The Association-in-Fact Enterprise**

94. The Investor Defendants, CBSG and Prime Time are separate individuals or entities associated with each other by shared personal and/or one or more contracts or agreements for the purpose of originating, underwriting, servicing and collecting usurious loans to the Plaintiffs and countless other small businesses throughout the United States.

95. This association of the Investor Defendants, CBSG, and Prime Time constitute a single association-in-fact enterprise (the "Lending Enterprise") within the meaning of 18 U.S.C. 1962(c), as the term is defined in 18 U.S.C. 1961(4).

96. The Lending Enterprise has an existence separate and apart from the illegal activity in which it engages by entering into legal financing agreements and attempting to collect lawful debts using legal collection practices.

**C. The Defendants' distinct roles in the Enterprise.**

97. Each of the Defendants has a distinct role in the Lending Enterprise.

98. The Investor Defendants provide capital for investment by the Lending Enterprise in lawful and unlawful loans, including the Agreements.

99. Prime Time acts as a broker for the Lending Enterprise, soliciting borrowers, including the Plaintiffs, obtaining necessary underwriting information for use by CBSG in underwriting the lawful and unlawful loans and assisting the collection of the lawful and unlawful loans by obtaining the borrowers authorization to effect daily ACH withdrawals from specified bank accounts.

100. CBSG underwrites, funds, services, and collects lawful and unlawful loans on behalf of the Lending Enterprise including the Agreements and exercises managerial authority over the Lending Enterprise.

**D. Engagement in Interstate Commerce**

101. The Lending Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

102. Specifically, the members of the Lending Enterprise maintain offices in Pennsylvania and use personnel in these offices to originate, underwrite, fund, service and collect on loans made by the Lending Enterprise to borrowers in Texas and throughout the United States via the extensive use of interstate emails, telephone calls, wire transfers and bank withdrawals processed electronically through an automated clearing house.

103. In the present case, all communications between the Lending Enterprise and Plaintiffs were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Lending Enterprise used interstate emails and telephone calls to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements, and collect the Daily Specific Amount via electronic interstate withdrawals processed through an automated clearing house.

**E. Conducting Affairs through a Pattern of Racketeering.**

104. CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though a pattern of racketeering activity (wire fraud) in violation of 18 U.S.C. 1962(c).

105. Beginning no later than September 1, 2014 and continuing today, CBSG devised and carried out a scheme to conduct the affairs of the Lending Enterprise to intentionally defraud borrowers in Texas and throughout the United States, including the Plaintiffs, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay and to intentionally defraud others into satisfying such loan obligations when a borrower defaulted.

106. Since CBSG and Prime Time are each web-based companies that conduct virtually all of their business through the internet, email communications, telephone calls, and wire transfers, it was reasonably foreseeable that interstate emails, telephone calls, and wire transfers would be used in furtherance of the scheme, and, in fact, intestate emails, telephone calls and wire transfers are used in furtherance of the scheme.

107. Specifically, CBSG directed, approved or ratified, Prime Time's use of the internet, interstate email, telephone calls, and other communications to intentionally defraud

borrowers in Texas and throughout the United States, including the Plaintiffs, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay.

108. As part of this scheme, by the use of interstate emails and telephone calls, Prime Time targets and solicits cash-strapped businesses upon which to pawn of usurious loans funded by CBSG. These interstate emails and telephone calls intentionally create the false impression that the usurious loans are legally enforceable by:

> (i) misrepresenting the true nature of the loan transactions as receivable sales in order to avoid applicable criminal usury laws;
>
> (ii) falsely representing that disguised loan contracts are enforceable when they are illegal under California or other applicable law;
>
> (iii) falsely claiming that the contracts are governed under the laws of Pennsylvania when CBSG, Fast Advance and Broadway know strong public policy considerations dictate that California or other state's laws would govern construction of the contracts;
>
> (iv) advising the illegal loans would be funded through interstate wire transfers; and
>
> (v) directing all loan repayments to be made by electronic interstate bank withdrawals via an automated clearing house.

109. Once the loans are approved by CBSG, CBSG furthers the scheme by using interstate wires to fund the unlawful loans and electronic interstate bank withdrawals to repay the amounts advanced under the disguised loans, all of which further create the impression that the usurious loans are legally enforceable contracts which CBSG knows to be false.

110. If a borrower defaults, CBSG uses interstate e-mails and telephone calls to once again fraudulently induce the borrowers to obtain new advances under loans funded by CBSG that CBSG knows misrepresent the true nature of the transaction in an effort to evade applicable usury laws and create the false impression that the contracts are legally enforceable when they

are not thereby inducing the borrowers to enter into and make payments on new usurious agreements to pay off the obligations under the old ones.

111. Upon information and belief, borrowers in Texas and throughout the United States, like the Plaintiffs, reasonably rely upon these knowingly false representations in order to enter into and make payments on criminally usurious loans.

112. In the present case, through a series of interstate e-mails in January 2017, Prime Time solicited Plaintiffs, provided Plaintiffs with a copy of the loan application, processed the loan application, and, upon approval by CBSG, provided Plaintiffs with a copy of the Agreement dated January 4, 2017 which Prime Time asked that Plaintiffs execute, together with a form authorizing CBSG to electronically withdrawal the daily payments from Fleetwood's Bank Account. Prime Time's actions were intentionally designed to and, in fact did, create the impression that the January 4, 2017 Agreement was a legally enforceable contract which Prime Time and CBSG knew to be false.

113. CBSG furthered the scheme against Plaintiffs by funding the January 2017 loan through an interstate wire transfer and thereafter withdrawing the Daily Specific Amount due under the Agreement by electronic interstate withdrawals processed through an automated clearing house, all of which was intentionally designed by CBSG to and, in fact did, create the impression that the Agreement was legally enforceable contract which CBSG knew to be false.

114. CBSG's scheme continued long after January 2017. When Plaintiffs had difficulty making the daily payments under the Agreement, CBSG or Prime Time, used similar emails and wire communications to intentionally create the false impression that each successive disguised loan was a legally enforceable contract in order to induce the Plaintiffs to enter into and make payments on the criminally usurious loans.

115. Plaintiffs reasonably relied upon these knowingly false representations to their detriment, as they executed each of the Agreements and were forced to pay interest in excess of Texas's criminal usury threshold.

116. CBSG's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343 which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Lending Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**F. Conducting Affairs Through the Collection of an Unlawful Debt**

117. The Agreements between Plaintiffs and CBSG constitute unlawful debt within the meaning of 18 U.S.C. 1962(c) because (1) they violate applicable criminal usury statutes, and (2) the rates are more than twice the legal rate.

118. CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though the collection of this unlawful debt in violation of 18 U.S.C. 1962(c).

119. Specifically, CBSG directed, approved or ratified, the obtainment by Prime Time of Plaintiffs' authorization to electronically withdrawal payments on an unlawful debt from Fleetwood Services' Bank Account.

120. Upon receipt of such authorization, CBSG did, in fact, make the daily withdrawals required by the Agreements.

**G. Injury**

121. As a direct and proximate cause of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs suffered, and continue to suffer, substantial injury to their business and/or property as Plaintiffs were forced to pay usurious amounts of interest and have lost, and will continue to lose, customers, profits, goodwill and business value.

## FIFTH CAUSE OF ACTION
**Contract**

122. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

123. The Agreement provides: "'[i]n the event that court determines that [Defendant] has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and [Defendant] shall promptly refund to Merchant any interest received by Funder in excess of the maximum lawful rate, it being intended that [Defendant] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

124. The transaction set forth above is as loan transactions.

125. Plaintiffs have paid, and Defendants CBSG and Prime Time have received, interest in excess of the maximum civil usury interest rate allowed by Texas law.

## SIXTH CAUSE OF ACTION
**Civil Conspiracy**

126. Defendants combined to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means. Defendants acted maliciously, without legal justification, and with the intent of injuring Plaintiffs. As such, Defendants have engaged in a civil conspiracy. In the course of their civil conspiracy, Defendants committed one or more unlawful, overt acts. Such unlawful, overt acts include Defendants' conduct described above. Such actions by Defendants subject such Defendants to joint and several liability.

## SEVENTH CAUSE OF ACTION
**Negligent Misrepresentation**

127. Defendants held themselves out as providing expert financial consulting services for the purpose of assisting Fleetwood Services with managing its existing debt and increasing its cash flow.

128. In connection with these financial consulting services, each of the MCA Defendants supplied Fleetwood Services with information for their own personal gain.

129. In providing this information, Defendants represented that they were providing specialized information to Fleetwood based on their expertise and knowledge of small business financing needs.

130. In providing this information, Defendants represented that the transaction at issue were designed to help Fleetwood Service's business grow and prosper.

131. In providing this information, Defendants represented that Fleetwood Service's business would be able to afford and comply with the terms and conditions of each transaction.

132. Each of these statements was made on or around January 2017.

133. In providing this information, Defendants failed to reasonably investigate Fleetwood Service's financial condition in order to reasonably assess the financial needs and capabilities of Fleetwood.

134. In providing this information to Fleetwood Services, Defendants placed their own financial gain ahead of Fleetwood Service's interests.

135. In providing this information to Fleetwood Services, Defendants intended and/or knew that the information provided would be used in the course of Fleetwood Service's own business activity.

136. In providing this information to Fleetwood Services, it was reasonably foreseeable that Fleetwood Services would rely upon the information provided by Defendants to Fleetwood.

137. The information provided by Defendants was false.

138. Any reasonably prudent financial consultant would have known that the information provided by Defendants was false.

139. Any reasonably prudent financial consultant would never have advised Fleetwood Services to enter into the transaction at issue.

140. Any reasonably prudent financial consultant would have known the transaction at issue would cause substantial financial harm to Fleetwood Service's business.

141. Any reasonably prudent financial consultant would have known that the transaction at issue would ***not*** help its business grow as promised and represented.

142. Fleetwood Services reasonably relied upon these knowingly false, misleading and/or negligent representations to its detriment.

143. But for these false representations by Defendants, Fleetwood Services would not have entered into the transaction at issue.

144. Defendants owed a duty of care to Fleetwood Services.

145. Defendants breached their duty of care to Fleetwood Services by providing false, misleading and/or negligent information to Fleetwood Services.

146. Fleetwood Services suffered damages as a direct result of Defendants' negligent representations and/or negligent conduct, by among other things, having to enter into additional subsequent loans and/or causing Fleetwood Services to default on subsequent loans with other MCAs.

147. Defendants are jointly-and-severally liable for all of the damages suffered by Fleetwood Services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Fleetwood Services, LLC, Robert L. Fleetwood and Pamela A. Fleetwood respectfully request that this Court enter an order:

a) Ordering Defendants to repay Plaintiffs all principal, interest and fees previously paid to Defendants in connection with the criminally usurious loan/agreement;

b) Awarding Plaintiffs direct and consequential damages in excess of $1,000,000 dollars, including prejudgment interest;

c) Awarding Plaintiffs treble damages;

d) Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

e) Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims that may be so tried.

Dated: February 15, 2018

BY: ______________________

Shane R. Heskin
Luke E. McDaniels
WHITE & WILLIAMS, LLP
1650 Market Street, Suite 1800
Philadelphia, PA 19103
(215) 864-6329
heskins@whiteandwilliams.com
lmcdaniels@whiteandwilliams.com
*Attorneys for Plaintiffs Fleetwood Services, LLC, Robert L. Fleetwood and Pamela A. Fleetwood*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Amended Complaint has been served via the Court's Electronic Case Filing System upon the following counsel of record on this 15th day of February, 2018:

Norman M. Valz, Esq.
Norman M. Valz & Associates, P.C.
205 Arch Street, 2nd Floor
Philadelphia, PA 19104
*Attorney for Defendants Complete Business Solutions Group, Inc. and Broadway Advance Funding, LLC*

Luke McDaniels, Esq.