IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FLEETWOOD SERVICES, LLC, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 18-268 |
| | : | |
| COMPLETE BUSINESS SOLUTIONS | : | |
| GROUP, INC. | : | |
| *doing business as* | : | |
| PAR FUNDING | : | |

### <u>MEMORANDUM</u>

**Juan R. Sánchez, C.J.**                                                                    **April 10, 2019**

Plaintiffs Fleetwood Services, LLC (Fleetwood Services), Robert L. Fleetwood, and Pamela A. Fleetwood (collectively, Plaintiffs), on their own behalf and on behalf of those similarly situated, bring claims for violations of the federal Racketeer Influenced and Corrupt Organizations Act (RICO) and Texas law against Defendants Complete Business Solutions Group, Inc. (CBSG), Prime Time Funding, LLC (PTF), and unnamed John and Jane Does (the Investor Defendants). Plaintiffs assert the Defendants worked together to exploit cash-strapped small businesses by luring them into endless cycles of usurious debt under the guise of false promises of consulting services and debt reduction. CBSG and PTF each moved to dismiss the claims against them. For the reasons explained below, the Court denied their motions to dismiss in its order of March 29, 2019.

**FACTS[1]**

Robert and Pamela Fleetwood are the owners of Fleetwood Services, a Texas limited liability company, which provides golf course construction, development, renovation, and

---

[1] This matter was originally filed in Texas state court. The matter was then removed to the United States District Court for the Northern District of Texas and transferred to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). On February 15, 2018, Fleetwood filed its First Amended Complaint, from which the Court draws the facts, unless otherwise indicated.

remodeling services. CBSG is a Delaware corporation headquartered in Philadelphia, Pennsylvania. PTF is a Pennsylvania entity also headquartered in Pennsylvania.

CBSG and PTF are engaged in the merchant cash advance industry, which is the merchant-to-merchant equivalent of consumer pay-day lending—an industry allegedly notorious for its predatory practices and extremely high interest rates. PTF and CBSG, along with the unidentified Investor Defendants, work together to fund, originate, underwrite, and service loans, which, like their consumer analogs, feature exorbitant annualized interest rates. Defendants have been engaged in this business—mostly through their online presence—since at least 2015.

In late 2016 or early 2017, Fleetwood Services experienced a cash shortage, but was ineligible for conventional financing. As a result, it entered into several merchant cash advance agreements, which ultimately encumbered the business with an obligation to make daily payments of $6,667.00 to its lenders. In January 2017, Fleetwood Services was approached by PTF and CBSG, who, through various email exchanges, offered to provide it with financial consulting and a debt consolidation program that would "provide capital for paying off existing debt as well as capital with which to grow the business." Am. Compl. ¶ 31. More specifically, PTF and CBSG claimed their assistance would reduce Fleetwood Services's daily payments by $1,666.75.

Defendants' promises, according to the Amended Complaint, were lies manufactured to conceal the true purpose behind CBSG and PTF's offer, which was to "worsen [] Fleetwood Services's cash flow and thereby increase its dependence on further loans exclusively from [] CBSG." Am. Compl. ¶ 41. And, this is exactly what is alleged to have happened to Fleetwood Services. After the funds provided at the beginning of the relationship were exhausted, Fleetwood Services was left "paying thousands of dollars more to [] CBSG than it had been paying prior to the debt consolidation program." Am. Compl. ¶ 40. Moreover, at around the time Fleetwood

2

Services experienced cash flow issues created by its obligation to Defendants, CBSG offered Fleetwood Services the "opportunity" to restructure its agreement with CBSG by spreading the amount owed over a larger number of smaller payments. As part of this supposed accommodation, CBSG charged Fleetwood Services $11,000 in "Finance Charges," which were not provided for in the parties' agreement. Am. Compl. ¶ 44. Ultimately, Fleetwood Services escaped its relationship with Defendants on July 5, 2017, after receiving a traditional small business loan that it used to repay Defendants in full, including what Plaintiffs' characterize as an undisclosed annualized percentage rate of interest at 114.07%.

The relationship between Plaintiffs and CBSG was governed by the terms of the "Factoring Agreement," which was executed on or about January 4, 2016. [2] *See* CBSG Mot. to Dismiss Ex. A at 2.[3] The Factoring Agreement obligated CBSG to provide Fleetwood Services with $370,000 (the Purchase Price) allegedly in exchange for $547,000 worth of Fleetwood Services accounts receivables (the Receipts Purchased Amount). *Id.* at 2. However, allegedly unlike a traditional factoring agreement, the fair market value of the accounts receivable (i.e., the Receipts Purchased Amount) was unilaterally dictated by CBSG and based upon the creditworthiness of *Fleetwood Services*—not the creditworthiness of the customers who were to pay the accounts receivable or

---

[2] Black's Law Dictionary defines "factoring" as "the buying of accounts receivable at a discount" and explains "the price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." *Factoring*, Black's Law Dictionary (10th ed. 2014).

[3] Ordinarily, a Court may not consider material extraneous to the complaint on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). There are, however, several exceptions to this general rule, including one for "indisputably authentic documents integral to or explicitly relied upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Here, the First Amended Complaint explicitly relies upon the Factoring Agreement, and no party has challenged the authenticity of the document. Accordingly, the Court will consider it in adjudicating the instant motions.

3

any appraisal of the actual value of Fleetwood Services' accounts receivable. Am. Compl. ¶ 34. The Factoring Agreement obligated Fleetwood Services to repay the Receipts Purchased Amount in 110 daily installments of $5,000.25, which were effectuated by electronic automated clearing house debits from Fleetwood Services's Texas-based bank accounts. These daily payments were, like the Receipts Purchased Amount, also divorced from Fleetwood Services's actual accounts receivable because the Factoring Agreement made "any and all receivables from any customer in any amount based on any sale subject to Defendant CBSG for payment of the daily fixed debit." *Id.* ¶ 35.

The Factoring Agreement contained several other terms material to the instant motions. These additional terms include: (1) a declaration the money provided by CBSG to Fleetwood Services "is not intended to be, nor shall it be construed as a loan;"; (2) CBSG's promise to refund Fleetwood Services any amount greater than the maximum lawful interest rate, in the event "a court determines that [CBSG] has charged or received interest" under the Agreement; and (3) a Pennsylvania choice of law provision. CBSG Mot. to Dismiss Ex. A at 2.[4] Along with the

---

[4] The pertinent paragraph of the Agreement states:

> [Fleetwood Services] and CBSG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from [CBSG] to [Fleetwood Services]. [Fleetwood Services] agrees that the Purchase Price is in exchange for Future Receipts pursuant to this Agreement [and] equals the fair market failure of such Receipts. [CBSG] has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to [CBSG] with respect to the full amount of the Receipts shall be conditioned upon [Fleetwood Service's] sale of products and services and the payment therefore by [Fleetwood Service's] customers in the manner provided in Section 1.1. IN NO EVENT SHALL THE AGGREGATE OF THE AMOUNTS RECEIVED BE DEEMED INTEREST HEREUNDER. In the event that a court determines that [CBSG] has charged or received interest hereunder, and that said amount is in excess of the highest applicable rate, the rate in effect hereunder shall be automatically reduced to the maximum rate permitted by applicable law and

Factoring Agreement, the Defendants also required Fleetwood Services to ensure repayment by granting CBSG security interests in "all accounts, chattel paper, documents, equipment, general intangibles, instruments and inventory . . . now or hereafter owned or acquired by [Fleetwood Services] and (b) all proceeds, as that term is defined in Article 9 of the UCC," and obligating Pamela and Robert Fleetwood to personally guarantee Fleetwood Services paid CBSG the Receipts Purchased Amount ($547,000). CBSG Mot. to Dismiss Ex. A at 5-6.

Based on the forgoing, Plaintiffs filed an Amended Complaint asserting claims for breach of Texas Business & Commercial Code § 17.44(a) (Count I); the Texas Usury Statute (Count II); common law fraud (Count III); RICO (Count IV); common law civil conspiracy (Count VI); and common law negligent misrepresentation (Count VII). In addition, the Amended Complaint seeks specific performance of paragraph 1.10 of the Factoring Agreement (Count V). CBSG and PTF moved to dismiss the Amended Complaint on February 16, 2018, and March 27, 2018, respectively. Although Defendants seek to dismiss Counts IV, V, and VII specifically, they claim the Factoring Agreements were not usurious loans under governing Pennsylvania law, an argument which, if credited, all parties agreed would require the dismissal of all but a few of Plaintiffs' claims.

---

[CBSG] shall promptly refund to [Fleetwood Services] any interested received by [CBSG] in excess of the maximum lawful rate, it being intended that merchant not pay or contract to pay, and that [CBSG] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by [Fleetwood Services] under applicable law. [Fleetwood Services] ACKNOWLEDGES THAT PENNSYLVANIA LAW APPLIES TO THE WITHIN AGREEMENT.

Agreement ¶ 1.10 (emphasis in original).

The Court held oral argument on the motions on November 2, 2018, and on March 29, 2019, it issued an order granting CBSG's motion as to Count V and denying it in all other respects. This order also denied PTF's motion to dismiss in its entirety. The Court writes now to supplement the order with the basis for its ruling.

**DISCUSSION**

Counts IV, V, and VII allege violations of RICO, seek specific performance, and allege negligent misrepresentation, respectively. The Defendants move to dismiss these counts pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating a Rule 12(b)(6) motion, a court first must separate the legal and factual elements of the plaintiff's claims. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210-11. The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

Before the Court can address the Defendants' arguments, it must first characterize the Factoring Agreement. If the Factoring Agreement is in substance a factoring agreement, i.e., a purchase of accounts receivable below their face value, then there can be no usury—and thus the Amended Complaint must be dismissed to the extent it relies on illegality of the alleged interest rates charged. *See Equip. Fin., Inc. v. Grannas*, 218 A.2d 81, 82 (Pa. Super. Ct. 1966) (noting

6

usury is not at issue where "there is no loan or use of money on the part of the buyer"); *Stedman v. Georgetown Sav. & Loan Ass'n*, 595 S.W.2d 486, 489 (Tex. 1979) ("For usury to apply there must be an overcharge by a lender for the use, forbearance, or detention of the lender's money so as to constitute interest."). If the Factoring Agreement functions as a loan, however, the Court must (1) determine whether it is subject to the usury laws of Pennsylvania or Texas, as the Agreement calls for the application of Pennsylvania law but the Plaintiffs assert Texas law applies, and (2) assess the merits of the Amended Complaint.

Despite the obvious significance of the issue, neither CBSG nor PTF offer any substantive defense of the Factoring Agreement as a true factoring agreement. CBSG claims—without legal citation or explanation—the transaction between it and Fleetwood Services is subject to Article 9 of the Uniform Commercial Code, which governs secured transactions. *See* CBSG Mot. to Dismiss 2. PTF makes no argument at all. As a result of Defendants' failure to effectively address this issue, the Court assumes—without deciding and only for purposes of the instant motions to dismiss—the Factoring Agreement was a loan. The Court's assumption is undergirded by the allegations in the Amended Complaint and a review of the Factoring Agreement as a whole.[5] *See Simpson v. Penn Discount Corp.*, 5 A.2d 796, 798 (Pa. 1939) ("As usury is usually accompanied by subterfuge and circumvention . . . to present the color of legality, it is the duty of the court to examine the substance of the transaction as well as its form."); *Gonzales County Sav. & Loan Ass'n v. Freeman*, 534 S.W.2d 903, 906 (Tex. 1976) ("It has often been said that courts will look

---

[5] The Court's assumption is supported by the allegations in the Amended Complaint describing: (1) how the "Daily Specified Amount," i.e., the daily $5,000.25 debit from Fleetwood Services' bank account, operated as a fixed loan payment, (2) how the "Purchased Amount," i.e., the $547,000 Fleetwood Services was obligated to repay, was the sum of the principal and interest of the loan; and (3) the manner in which the Factoring Agreement shifted all risk of loss from Defendants to Fleetwood Services and Pamela and Robert Fleetwood. *See* Am. Compl. ¶¶ 47-58.

beyond the form of the [transaction] to its substance in determining the existence or nonexistence of usury . . . Labels put on particular charges are not controlling.").

Assuming the Factoring Agreement is a disguised loan, the Court must determine whether the Factoring Agreement is governed by Pennsylvania law (as specified in Paragraph 1.10 of the Factoring Agreement) or Texas law (as Plaintiffs argue). The parties agree if the Court concludes Pennsylvania law applies to claims arising from the Factoring Agreement, all but a few of Plaintiffs' causes of action must be dismissed (i.e., those that rely on a finding the Factoring Agreement constituted a loan with usurious interest under Texas law). They also agree the Court must apply Pennsylvania's choice of law principles to resolve the alleged conflict between Pennsylvania and Texas usury laws.  Pennsylvania utilizes Restatement (Second) of Conflict of Laws § 187(2) where there is a "true conflict" involving a question of contract law. *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 463-64 (3d Cir. 2005).[6]  Restatement Section 187(2) requires the Court to apply the law of the state specified in the agreement unless:

(a) The chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) Application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of Restatement (second) of Conflicts of Law], would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 621-22 (3d Cir. 2009) (quoting Restatement § 187(2)); *see also Chestnut v. Pediatric Homecare of Am., Inc.*, 617 A.2d 347, 350-51 (Pa. Super. Ct. 1992) (applying Restatement § 187).

---

[6] A "true conflict" exists where "the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied." *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005) (alteration in original).

The Defendants' conclusory arguments to the contrary notwithstanding, Plaintiffs have averred sufficient facts to warrant the application of Texas law. As an initial matter, the Court finds a "true conflict" between Pennsylvania and Texas law concerning usury. In *Kaneff* (discussed in greater detail below), the Third Circuit has recognized "there [could] be no question" a "true conflict" existed where the law of one jurisdiction has an applicable usury law, and the other does not. *Kaneff*, 587 F.3d at 622 (noting Delaware does not have usury laws, and Pennsylvania does have a general usury law, and concluding "[t]here can be no question that there is a true conflict between Delaware and Pennsylvania in their approach to and treatment of usurious interest."). This is the case here: Pennsylvania has no usury protections for businesses, and Texas does. *Compare* 15 Pa. Cons. Stat. § 1510 ("A business corporation shall not plead or set up usury, or the taking of more than the lawful rate of interest…as a defense to any action…or to enforce payment of…any obligation executed or effected by the corporation.") *with* Tex. Fin. Code § 305.001(a-1)("A creditor who contracts for or receives interest that is greater than the amount authorized by this subtitle in connection with a commercial transaction is liable to the obligor…."). Accordingly, the Court finds there is a true conflict between Pennsylvania and Texas usury laws.

Having found a "true conflict," the Court turns to Restatement § 187(2)(b), which calls for a two-part inquiry.[7] First, the Court must determine whether, under Restatement § 188, the chosen state or another state's law would apply in the absence of the choice of law provision. Restatement § 188 calls for the application of the law of the state which has

---

[7] Restatement §187(2)(a) permits a court to disregard a choice of law provision where the chosen state "has no substantial relationship to the parties or to the transaction and there is no other reasonable basis for the parties' choice." This provision is inapplicable. CBSG's principal place of business is located in Pennsylvania where Plaintiffs concede that at least part of the parties' course of dealing took place. Amended Compl. § 21; Opp'n to CBSG Mot. 10. As a result, § 187(2)(a) provides no basis to disregard the choice of law provision.

> the most significant relationship to the transaction as determined by several factors, including: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Restatement § 188(1-2); *see also Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 233 (3d Cir. 2007) (applying the § 188 factors to determine whether Pennsylvania had the most significant contacts in a choice of law analysis).[8] Second, if the Court finds the § 188 balancing requires the application of the law of a state other than the chosen state, the Court must then determine whether applying the chosen state's law would contravene a "fundamental policy" of the other state. Restatement § 187(2)(b). So, to apply Texas law, the Court must find Texas has the most significant relationship to the transaction *and* a fundamental public policy of Texas would be violated by the application of Pennsylvania law.

The issue before the Court is similar to the one decided by the Third Circuit in *Kaneff.* 587 F.3d 616. Kaneff—a Pennsylvania resident—traveled to Delaware to obtain a short-term loan secured by a lien against the title to her automobile. The annualized interest rate of the loan was approximately 300%. After falling behind on her payments, Delaware Title Loans (DTL) repossessed her vehicle, and Kaneff sued DTL in Pennsylvania state court. DTL removed the action and sought to compel arbitration. Kaneff opposed the motion to compel on unconscionability grounds. In deciding the arbitrability of Kaneff's challenge to the title loan, the

---

[8] Pennsylvania Supreme Court has never formally disavowed the rule of lex loci contractus, which calls for the application of the law of the place of contracting. *Hammersmith*, 480 F.3d at 227-29 (describing the history of Pennsylvania choice of law jurisprudence in contract and tort actions). Nevertheless, the Third Circuit has predicted the Pennsylvania Supreme Court would extend its ruling abolishing lex loci delicti in tort matters in favor of the application of the "law of the forum with the most interest in the problem" to contract matters. *Id.* at 228-29. This Court will, as it must, follow the Third Circuit's lead. *Id.*; *see also Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America*, 693 F.3d 417, 432 (3d Cir. 2012).

Court considered whether it must apply the law of Pennsylvania—which prohibits usurious loans to consumers—or the law of Delaware—which does not prohibit usurious loans, but was the state law selected in the contract's choice of law provision.

The Third Circuit found Pennsylvania had a more significant interest than Delaware because the plaintiff lived in Pennsylvania, the collateral was located in Pennsylvania, and, that if Kaneff's car were repossessed and she lost her job as a result, Pennsylvania would have to pay her unemployment and medical benefits, and lose the taxes generated from her income. Citing Pennsylvania's "antipathy to high interest rates such as the 300.01 percent interest charged in the contract at issue," the Court also found applying Delaware law would violate a fundamental public policy of the Commonwealth. *Id* at 624. As a result, the Court found the law of Pennsylvania should be applied to Kaneff's title loan, and the choice of law provision in the loan documents discarded. *Id.*

A similar situation is before the Court here. As an initial matter, Plaintiffs have averred sufficient facts—which the Court must accept as true—to establish Texas's materially greater interest in this dispute. As Plaintiffs aver, Fleetwood Services is a Texas limited liability company headquartered in Dallas, Texas, and Robert and Pamela Fleetwood are individuals residing in Dallas, Texas. Amend. Compl. ¶¶ 18-20. Furthermore, the commercial and personal property—including Robert and Pamela's home and personal assets—securing repayment is located in Texas. Amend. Compl. ¶ 43. Plaintiffs also allege Defendants' "conduct in inducing Plaintiffs to enter into the [Factoring Agreement] involved a series of consumer and commerce related transactions that substantially occurred within the state of Texas." Amend. Compl. ¶ 61. In light of these circumstances (and Defendants' failure to explain how or why the Court should disregard them, or consider other factors weighing in favor of Pennsylvania's relationship to the transaction at

issue), the Court finds Texas has a more significant relationship to the transaction than Pennsylvania.

The Court also finds applying Pennsylvania law would violate a fundamental public policy of Texas, namely its "antipathy" to high interest rates, regardless of the nature of the debtor. *Kaneff*, 587 F.3d at 624. As Plaintiffs point out, the Texas constitution prohibits usury. *See* Opp'n to CBSG Mot. at 10 (citing Texas Const., Art. XVI § 11). Moreover, the Texas Financial Code sets a specific maximum interest rate for lending for "a business, commercial, investment, or other similar purpose." *See* Tex. Fin. Code § 303.009(c). The Texas Financial Code also permits private causes of action for usury in commercial transactions. Texas Fin. Code § 305.001(a-1)("A creditor who contracts for or receives interest that is greater than the amount authorized in this subtitle *in connection with a commercial transaction* is liable to the obligor….") (emphasis added). This statutory framework makes clear the existence of Texas's fundamental public policy against the payment of excessive interest rates—no matter the character of the debtor. As a result, enforcing Pennsylvania law—which affirmatively *prohibits* several types of business entities from claiming a usury defense—would violate Texas's policy. *See* 15 Pa. Con. Stat. § 1510(a).[9] On this basis,

───────────────

[9] In full, this statutory provisions states:

> A business corporation shall not plead or set up usury, or the taking of more than the lawful rate of interest, or the taking of any finance, service or default charge in excess of any maximum rate therefor provided or prescribed by law, as a defense to any action or proceeding brought against to recover damages on, or to enforce payment of, or to enforce any other remedy on, any obligation executed or effected by the corporation.

15 Pa. Con. Stat. § 1510(a). Although this provision applies directly to "business corporations," it is elsewhere made applicable to "domestic associations" and "foreign associations." *See* 15 Pa. Con. Stat. § 114 ("A domestic association other than a business corporation shall be subject to section 1510 . . . with respect to obligations . . . to the same extent as if the domestic association were a domestic business corporation."); 15 Pa. Con. Stat. § 402(g) ("A foreign association shall be subject to section 1510 . . . with respect to obligations . . . to the same extent as if the foreign association were a domestic business corporation.").

the Court finds that applying Pennsylvania law would violate Texas's fundamental public policy against usury.

Having determined Texas has the most significant relationship to the transaction at issue here and enforcing Pennsylvania law would violate Texas's fundamental public policy against usury without regard to the nature of the debtor, the Court concludes the Factoring Agreement is subject to Texas law. *See Kaneff*, 587 F.3d at 621-22; *Chestnut*, 617 A.2d at 350-51; Restatement (Second) of Conflict of Laws § 187(2). The Court will, therefore, deny the motions to dismiss to the extent they are premised on Defendants' argument that their conduct was permissible under Pennsylvania law. The Court next turns to the merits of the Defendants' motions. Because the motions focus primarily on the Plaintiffs' RICO claim, the Court will consider that issue first, and then address Defendants' arguments with respect to the specific performance and negligent misrepresentation claims.

The heart of Plaintiffs' Amended Complaint, and the focus of CBSG and PTF's respective motions to dismiss, is the civil RICO claim. At issue is the application of 18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To state a claim for relief under this statute, a person[10] must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010).[11]   A person must also establish

---

[10] A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

[11] Texas law applies to the Factoring Agreement, but the Court applies federal law to the RICO claim. *See Williams v. Stone*, 109 F.3d 890, 895 (3d Cir. 1997) (noting "the state law offenses the [plaintiffs'] claim were committed by [the defendant] serve no more than a 'definitional purpose'

standing to bring a RICO claim by alleging he was "injured . . . by reason of a violation of § 1962." *Anderson v. Ayling*, 396 F.3d 265, 269 (3d Cir. 2005). CBSG and PTF each move to dismiss on the grounds the Amended Complaint fails to allege a cognizable enterprise, predicate acts of racketeering activity, and lack of standing. None of these arguments is availing.[12]

First, Defendants argue the Amended Complaint fails to adequately allege a RICO "enterprise." The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Here, Plaintiffs allege the existence of an "association-in-fact" enterprise, which requires its own three-part showing: "(1) there exists an ongoing organization, formal or informal; (2) the various associates of the organization function as a continuing unit; and (3) the organization has an existence separate and apart from the alleged pattern of racketeering activity." *Schwartz v. Lawyers Title Ins. Co.*, 970 F. Supp. 2d 395, 402 (E.D. Pa. 2013) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). To ultimately prevail, a plaintiff must also establish three "structural" features of the enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* (quoting *Boyle v. United States*, 556 U.S. 938, 940 (2009)).

The Court finds the Amended Complaint satisfies both *Turkette* and *Boyle* at this stage. The Amended Complaint describes the "Lending Enterprise" as a group of John and Jane Doe

---

vis-à-vis an allegation of a RICO violation—they merely define the types of activity that may constitute predicate acts pursuant to the federal RICO statute"). The parties cite primarily to Third Circuit and Supreme Court authority in support of their respective positions, and so the Court assumes for purposes of the instant motions that Third Circuit precedent applies. However, the Court will defer making a definitive ruling on this choice of law question until the parties have had an opportunity to fully brief the issue.

[12] In their opposition, Plaintiffs also address whether they have adequately alleged a pattern of racketeering. However, Defendants do not appear to have raised this issue so the Court will not consider it.

individuals and two corporate entities associated with one -another which that engaged in unlawful activity, including in a course of conduct (*i.e.*, mail and wire fraud, and the collection of unlawful debts—both of which are discussed below) for a common purpose (to make money). This "Lending Enterprise" also featured included an informal, on-going organization which operated as a unit to provide both legal credit services and the allegedly usurious loans. It is thus sufficient under *Turkette*. *See United States v. Bergrin*, 650 F.3d 257, 270 (3d Cir. 2011). To the extent Defendants challenge the third *Turkette* element—the alleged enterprise's existence separate and apart from the business entities—the Court is satisfied Plaintiffs have met this requirement. The Amended Complaint alleges Defendants have done more than carry on the normal affairs of actors in the legal credit market. Rather, the Amended Complaint explains how they each worked together in this scheme to originate, underwrite, and service loans with illegal interest rates. Each player in the enterprise had a different role, but the alleged enterprise was greater—and distinct from—its component parts (at least some of which were likely legitimate).

The Court is also satisfied that the Amended Complaint meets the *Boyle* requirements. The Amended Complaint "plausibly impl[ies]" the purpose of the enterprise was to make money by means of luring small businesses into otherwise unenforceable loans or collecting unlawful debts, there were relationships between each of the members (the John and Jane Does provided the capital, PTF brokered the loans, and CBSG serviced them), and sufficient longevity (from at least 2015) to accomplish that purpose. *Brokerage*, 618 F.3d at 370. Thus, the Amended Complaint is also sufficient under *Boyle*.

CBSG also challenges Plaintiffs' ability to plead the existence of an enterprise because companies engaged in the "provision of routine credit services," like CBSG, are beyond the scope of RICO liability. CBSG Mot. to Dismiss 11-12. CBSG cites *Jubelirer v. Mastercard Int'l., Inc.*,

68 F. Supp. 2d 1049, 1052-53 (W.D. Wisc. 1999), and *In re Mastercard Int'l, Inc.*, 132 F. Supp. 2d 468, 487 (E.D. La. 2001) in support of this position. The Court is not persuaded. As an initial matter, *Jubelirer* and *Mastercard* were the product of concerns about unbounded RICO liability based on the "many million combinations of merchant, MasterCard and lender." *Jubelirer*, 68 F. Supp. 2d at 1053. Nothing in this case suggests a similar issue here. Moreover, the persuasive value of *Jubelirer* and *Mastercard*, which turned on the plaintiffs' failure to allege hierarchical or consensual decision making, is unclear in light of *Boyle*, which rejected a rigid definition of association-in-fact enterprises. *See Boyle*, 556 U.S. at 948.[13] As a result, the Court will not dismiss the RICO claim on this basis.

The Defendants next challenge the RICO claim on the basis the Amended Complaint fails to adequately allege "racketeering activity," as required by 18 U.S.C. § 1962(c). The definition of "racketeering activity" includes wire fraud in violation of 18 U.S.C. § 1343. 18 U.S.C. § 1961(1). "Mail or wire fraud consists of (1) a scheme to defraud, (2) use of the mail or interstate wires to

---

[13] More specifically, the Supreme Court noted:

> As we said in Turkette, an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Boyle*, 556 U.S. at 948.

16

further that scheme, and (3) fraudulent intent." *Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003) (citing *United States v. Pharis*, 298 F.3d 228, 233 (3d Cir. 2002)).[14]

At its core, the Amended Complaint alleges the Defendants engaged in a scheme to defraud by intentionally misrepresenting the enforceability of the Factoring Agreement, when, in fact, the Factoring Agreement was a usurious, and thus unenforceable, loan. As evidence, Plaintiffs allege the existence of (but have not actually filed with the Court) two email exchanges between Plaintiffs, PTF, and CBSG, in January 2017, in which Defendants fraudulently (1) claimed the Agreement would help move Fleetwood Services away from cash advances and save money, and (2) the Agreement was legally enforceable. In further support of its claim, Plaintiffs allege Defendants' use of the interstate wires to electronically debit its bank account "further created the impression" the Factoring Agreement was enforceable, and once Fleetwood Services experienced issues making payments, Defendants used emails and other wire communications to bolster this impression.

The Defendants claim the allegations supporting Plaintiffs' wire fraud theory are insufficient to withstand scrutiny under Federal Rule of Civil Procedure 9(b), which requires a party to "state with particularity the circumstances constituting fraud," and applies to RICO claims alleging wire fraud. *Schwartz*, 970 F. Supp. at 406. The purpose of this heightened burden is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants from spurious charges of immoral and fraudulent behavior." *Id.* (quoting

---

[14] "The mail fraud and the wire fraud statute are 'in pari materia and are, therefore, to be given similar constructions." *United States v. Fumo*, 628 F. Supp. 2d 573, (E.D. Pa. 2007) (quoting *United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir. 1977), *abrogated on other grounds by Griffin v. United States*, 502 U.S. 46 (1991)). Thus, cases construing the mail fraud statute are equally applicable to the wire fraud statute. *Id.*

*Seville Indust. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). Allegations of a misrepresentation's date, place, or time are sufficient, but not necessary to satisfy Rule 9(b); a plaintiff is also "free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville*, 742 F.2d at 791. Nevertheless, a plaintiff "must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004), *abrogated in part on different grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Conditions of a person's mind, including knowledge and intent, "may be alleged generally." Fed. R. Civ. P. 9(b); *see also Marangos v. Swett*, 341 F. App'x 752, 757 (3d Cir. 2009) ("Rule 9(b) requires particularity when pleading fraud, but it allows factual matter concerning malice, intent, and knowledge to be alleged generally under the 'less—than—rigid—though still operative—strictures of Rule 8.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009))).

Defendants argue the Amended Complaint must be dismissed because it fails to "specify the identity of any person making any purported misrepresentation; the time, place[,] and content of the alleged misrepresentation; and the method by which the misrepresentation was communicated and to whom." CBSG Mot. to Dismiss 14. The Court disagrees. The Court is satisfied Plaintiffs have alleged "who made a misrepresentation to whom and the general content of that misrepresentation," *Lum*, 361 F.3d at 224, and that the Amended Complaint suffices to put Defendants on the notice of the "precise misconduct with which they are charged," *Seville*, 742 F.2d at 791.  As recounted above, the Amended Complaint alleges (1) a scheme to defraud borrowers and their guarantors by luring them into credit arrangements with illegal interest rates, despite Defendants' knowledge of the illegality of those rates, (2) the use of the wires (i.e., January, 2017, emails and ACH debits between Defendants and Fleetwood Services furthering the false

impression of the enforceability of the unenforceable agreements) to further the scheme, and (3) Defendants engaged in this scheme with the intent to defraud (which may be averred generally). As a result, the Court will deny Defendants' motion to dismiss on this ground.

Even if the Amended Complaint failed to properly allege wire fraud, the Court would not grant Defendants' motion to dismiss on the grounds Plaintiffs failed to establish a RICO violation. An enterprise violates RICO not only by conducting its affairs through a "pattern of racketeering activity," but also by engaging in the "collection of unlawful debt." 18 U.S.C. § 1962(c). An "unlawful debt" is defined as a debt "(A) incurred or contracted . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) . . . which was incurred in connection with . . . the business of lending money . . . at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Defendants do not challenge Plaintiffs' allegation the payments Fleetwood Services made amounted to "collection of unlawful debt" and the Amended Complaint sufficiently alleges a RICO violation based on this theory.

The Defendants also move to dismiss on the grounds Plaintiffs lack standing to prosecute their RICO claim. As noted above, RICO standing "requires a plaintiff to show (1) that he was injured (2) by reason of a violation of § 1962." *Anderson*, 396 F.3d at 269. The "injury" element "can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). Three factors guide the assessment of whether an alleged RICO violation proximately caused the injury: "(1) the directness of the injury, (2) the difficulty of apportioning damages, and (3) whether there are direct victims of the alleged violation that could better vindicate the policies underlying RICO." *Knopick v. UBS Fin. Servs., Inc.*, 121

F. Supp. 3d 444, 460 (E.D. Pa. 2015) (citing *Holmes v. Sec. Inv'r Prot.*, 503 U.S. 258, 269-70 (1992)).

Defendants offer little argument in support of their position. They claim the Amended Complaint "fail[s] to state what damages [Plaintiffs have] actually suffered as a result of Defendants' actions." CBSG Mot. to Dismiss 15; *see also* PTF Mot. to Dismiss 8 ("Plaintiffs have not shown any damages caused by Defendants' actions."). The Court disagrees. As Plaintiffs point out, Plaintiffs allege they have been damaged in the amount of the usurious interest payments and lost profits. Am. Compl. ¶ 121. Both categories of damages are compensable RICO injuries. *See Maio*, 221 F.3d 472; *see also Frankford Trust Co. v. Advest, Inc.*, 943 F. Supp. 531, 533-34 (E.D. Pa. 1996) ("The vast majority of cases that have addressed this issue . . . have ruled that lost profits, or expectancy damages are recoverable under RICO, subject to proof of proximate causation and that the damages are not speculative."). As a result, the Court finds Plaintiffs have alleged a cognizable loss.

The Court also finds Plaintiffs' alleged damages—the usurious payments and lost profits—were proximately caused by Defendants' RICO violations—Defendants' pattern of racketeering activity *and* collection of unlawful debts. Defendants did not make any argument as to how or why the factors discussed in *Knopick* and *Holmes* weigh against a finding of proximate cause. Accordingly, the Court need not analyze them in any great depth, other than to say the usurious payments and lost profits appear to stem directly from Defendants' alleged violations of both aspects of § 1962(c), the Court perceives no potential difficulty apportioning damages (at least at this stage), and there does not appear to be a more directly injured party. *Knopick*, 121 F. Supp. 3d at 460. As a result, the Court finds the Amended Complaint alleges sufficient proximate cause.

The Amended Complaint sufficiently alleges an association-in-fact enterprise, RICO violations, and damages sufficient to establish Plaintiffs' standing to bring their claim. The Court will, therefore, deny Defendants' motions to dismiss as they pertain to Plaintiffs' RICO claim.

Having addressed the sufficiency of Plaintiffs' RICO claim, the Court turns to the claims for specific performance (Count V) and negligent misrepresentation (Count VII). CBSG moves to dismiss Count V of the Amended Complaint, which is entitled "Contract," and seeks recovery based on Paragraph 1.10 of the Factoring Agreement. The Court will dismiss Count V, but not for the reasons advanced by CBSG. Count V is properly construed as a claim for specific performance of Paragraph 1.10. However, Texas law [15] does not recognize a cause of action for specific performance independent of a claim for breach of the underlying contract, and Plaintiffs have not alleged CBSG breached Paragraph 1.10 by retaining the difference between what it was paid in interest and the legal maximum rate of interest after a court characterized the Factoring Agreement as a loan. *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App. 2007) ("Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract."). Thus, this stand-alone claim for specific performance shall be dismissed without prejudice to reassertion as a measure of damages.

Finally, Defendants' motions challenge Plaintiffs' claim for negligent misrepresentation (Count VII), arguing that the Amended Complaint is too vague. CBSG offers no legal citation in support of its argument, and PTF only gestures towards Rule 9(b) without explaining how or why

---

[15] The Court applies Texas law to this claim because it is tied directly to the Factoring Agreement, which the Court found is governed by the law of Texas, and because the law of Texas would apply in the absence of the transfer from the Northern District of Texas to this Court. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("[W]here the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change in venue. A change of venue under § 1404(a) generally should be, with respect to state law, but a change in courtrooms.").

that rule would apply. *See* CBSG Mot. to Dismiss 15; PTF Mot. to Dismiss 8. The Court will not dismiss this aspect of the Amended Complaint. Although Texas law appears to govern the substantive aspects of the claim, *Van Dusen*, 376 U.S. at 639, it is not clear—and Defendants have not explained—whether courts in the Fifth Circuit apply Rule 9(b)'s specific pleading requirements to negligent misrepresentation claims arising under Texas law. *Compare Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (noting "[a]lthough Rule 9(b) by its terms does not apply to negligent misrepresentation claims, this court has applied the heightened pleading requirements when the parties have not urged a separate focus on the negligent misrepresentation claims"), *with Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668 (5th Cir. 2004) ("Rule 9(b)'s stringent pleading requirements should not be extended to causes of action not enumerated therein. Accordingly, plaintiffs' negligent misrepresentation claims are only subject to the liberal pleading requirements of Rule 8(a)."). In light of Defendants' failure to explain why the allegations are too vague or whether Rule 9(b) applies to this claim—and the Court's conclusion that the RICO claim which also references Defendants' alleged misrepresentations is sufficient to go forward—the Court will deny the motions to dismiss.

**CONCLUSION**

In light of the foregoing, the Court granted CBSG's motion to dismiss as it pertains to Count V, and denied it in all other respects, and denied PTF's motion to dismiss in its entirety.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.